IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| LA PALOMA GENERATING | : | Bankr. Case No. 16-12700-JTD |
| COMPANY LLC, *et al.*, | : | (Jointly Administered) |
| | : | |
| Debtors. | : | |
| | : | |
| AD HOC GROUP OF SECOND LIEN | : | |
| CREDITORS, | : | |
| Appellant, | : | Civ. No. 17-1697-LPS |
| v. | : | Civ. No. 19-17-LPS |
| | : | |
| LNV CORPORATION, | : | |
| | : | |
| Appellee. | : | |

Glenn E. Siegel, Esq., Joshua Dorchak, Esq., and T. Charlie Liu, Esq. of MORGAN, LEWIS & BOCKIUS LLP, New York, NY.

Jody C. Barillare, Esq., of MORGAN, LEWIS & BOCKIUS LLP, Wilmington, DE.

 Attorneys for Appellant Ad Hoc Group of Second Lien Creditors.


Thomas E. Lauria, Esq., of WHITE & CASE LLP, Miami, FL.

J. Christopher Shore, Esq. of WHITE & CASE LLP, New York, NY.

Roberto J. Kampfner, Esq., of WHITE & CASE LLP, Los Angeles, CA.

Jeffrey M. Schlerf, Esq., of FOX ROTHSCHILD LLP, Wilmington DE.

 Attorneys for Appellee LNV Corporation.

## **MEMORANDUM OPINION**

September 24, 2019
Wilmington, Delaware



**STARK, U.S. District Judge:**

## I. INTRODUCTION

These appeals arise from a dispute under a Collateral Agency and Intercreditor Agreement, dated August 16, 2005 ("ICA"), among members of the Ad Hoc Group of Second Lien Creditors (together "2L Group")[1] and appellee LNV Corporation ("LNV").[2] On November 20, 2017, 2L Group appealed the order (B.D.I. 869)[3] ("Confirmation Order"), entered by the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court"), confirming the above-captioned debtors' plan of reorganization (Civ. No. 17-1697-LPS D.I. 1) ("Plan Appeal"). 2L Group contends that the Plan Appeal concerns whether the Bankruptcy Court had "the power to confirm a Chapter 11 plan to the extent it contained a provision that modified the relative rights between certain creditors under [the ICA]." (*Id.*, D.I. 4) At the time of the Plan Appeal, the "relative rights between certain creditors under [the ICA]" ("Intercreditor Dispute") remained pending before the Bankruptcy Court, and the outcome of that dispute may have rendered the Plan Appeal moot. (*Id.*, D.I. 15, 16) Therefore, at the parties' request, the Court deferred briefing of the Plan Appeal pending the Bankruptcy Court's adjudication of the

---

[1] At the time the appeals were filed, 2L Group included: Ares Capital Corporation, Avenue Capital Management II LLP, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Neuberger Berman Investment Advisers LLC, Solus Alternative Asset Management LP, Värde Partners, Inc., and Wilmington Trust, National Association, as Administrative Agent. (ICA Appeal, D.I. 14) As discussed herein, Solus Alternative Asset Management LP is the sole remaining member of 2L Group.

[2] LNV refers herein to both LNV Corporation and its designee, CXA La Paloma, LLC. (ICA Appeal, D.I. 12 at 1 n.2)

[3] The docket of the Chapter 11 cases, *In re La Paloma Generating Company, LLC, et al.*, Case No. 16-12700-CSS (Bankr. D. Del.), is cited herein as "B.D.I. __." LNV's appendix in support of its answering brief (ICA Appeal, D.I. 21-2) is cited herein as "A__."

Intercreditor Dispute. (*Id.,* D.I. 17) On December 27, 2018, the Bankruptcy Court issued its opinion with respect to the Intercreditor Dispute. *In re La Paloma Generating Co., et al.,* 595 B.R. 466 (Bankr. D. Del. 2018) ("ICA Decision").[4] On January 4, 2019, 2L Group appealed the ICA Decision. (Civ. No. 19-17-LPS D.I. 1) ("ICA Appeal")

Thereafter, the Court entered a scheduling order to govern combined briefing on dispositive motions and the merits of both appeals. (*See* ICA Appeal, D.I. 20) LNV moved to dismiss both appeals as moot under 11 U.S.C. § 363(m) and the doctrine of equitable mootness. (Plan Appeal, D.I. 24; ICA Appeal, D.I. 12) ("Motions to Dismiss")[5] The Motions to Dismiss are fully briefed.[6] The merits of the appeals are also fully briefed.[7] No party requested oral argument.

On July 15, 2019, 2L Group filed a Notice of Withdrawal in each appeal (Plan Appeal, D.I. 41; ICA Appeal, D.I. 23) indicating that, pursuant to a Settlement and Assignment Agreement dated June 6, 2019, certain members of 2L Group had agreed to withdraw and participate no further in the appeals. Accordingly, the sole remaining member of 2L Group (and

---

[4] The ICA Decision adjudicated two motions: (i) Motion to Enforce Intercreditor Agreement (B.D.I. 695) ("2L Motion") filed by 2L Group, and (ii) Motion to Enforce Intercreditor Agreement (B.D.I. 739) ("1L Motion") filed by LNV. The ICA Decision denied the 2L Motion and granted the 1L Motion.

[5] LNV represents that, with the exception of their respective captions and introductory paragraphs, the motion to dismiss filed in each appeal is identical. (ICA Appeal, D.I. 12 at 1 n.4)

[6] *See* Plan Appeal, D.I. 24, 33, 35; ICA Appeal, D.I. 12, 17, 19. In connection with the Plan Appeal, the Debtors and the Official Committee of Unsecured Creditors, as intervenor (D.I. 14), have filed certain joinders to LNV's pleadings. (*See* D.I. 27, 28, 36, 39)

[7] *See* Plan Appeal, D.I. 30, 38, 40; ICA Appeal, D.I. 14, 21, 22.

sole appellant in these appeals) is Solus Alternative Asset Management LP. For ease of reference, however, the Court refers to appellant throughout as "2L Group."

For the reasons stated below, the Court will deny the Motions to Dismiss and affirm the Confirmation Order and ICA Decision.

## II.   BACKGROUND

### A.   First Lien Obligations, Second Lien Obligations, and ICA

Debtors owned and operated a natural gas fired power plant in McKittrick, California (the "Plant"). Prior to the commencement of the Chapter 11 cases on December 6, 2016 (the "Petition Date"), Debtors were indebted to LNV and 2L Group's members under certain credit agreements. On the Petition Date, La Paloma owed LNV approximately $330 million under two separate agreements dated February 20, 2014 (together, the "First-Lien Credit Agreements"): (i) a First-Lien Working Capital Agreement; and (ii) a First-Lien Credit Agreement.[8]  LNV was the sole lender under the First-Lien Credit Agreements.[9]  La Paloma's obligations under the First Lien Credit Agreements (the "First-Lien Obligations") were secured by a first priority lien on substantially all the Debtors' assets, pursuant to, among other documents: (i) a deed of trust and assignment of rents recorded as Kern County California instrument 000214020051 (the "Deed of Trust");[10] (ii) a First-Lien Security Agreement dated August 16, 2005 (the "First-Lien Security

---

[8] A11, ¶ 22; Proof of Claim No. 46, Addendum & Ex. A (A918, 922).

[9] Proof of Claim No. 46, Addendum & Ex. A (A918, 922).

[10] B.D.I. 740, Ex. B (A351).

Agreement");[11] and (iii) a First-Lien Pledge Agreement dated August 16, 2005 (the "First-Lien Pledge Agreement").[12]

La Paloma was indebted to 2L Group's members as lenders under a Second-Lien Credit Agreement dated February 20, 2014 (the "Second-Lien Credit Agreement"), under which approximately $110 million was outstanding on the Petition Date.[13] La Paloma's obligations under the Second-Lien Credit Agreement were secured by a second priority lien on substantially all the Debtors' assets pursuant to, among other documents: (i) the Deed of Trust; (ii) a Second-Lien Security Agreement dated August 16, 2005 (the "Second-Lien Security Agreement"); and (iii) a Second-Lien Pledge Agreement dated August 16, 2005 (together with the Deed of Trust, the First-Lien Security Agreement, the Second- Lien Security Agreement, and the First-Lien Pledge Agreement, the "Granting Documents").[14]

Each security interest under each Granting Document was granted exclusively in favor of The Bank of New York Mellon as collateral agent (the "Collateral Agent") for the benefit of the lenders under the First-Lien Credit Agreement (LNV) and the lenders under the Second-Lien Credit Agreement (2L Group members). Each of those lenders and the Collateral Agent is a party to the ICA.[15]

---

[11] *Id.* at Ex. C (A402).

[12] Proof of Claim No. 47, Addendum & Ex. A (A926, 929).

[13] Proof of Claim No. 56, Addendum at 1-2 (A971-72).

[14] *Id.* at 3 (A973).

[15] B.D.I. 740, Ex. A (A269).

The ICA governs the parties' rights with respect to the "Collateral." As the recitals to the ICA state, the term "Collateral" embraces substantially all of the Debtors' assets.[16] Collateral is defined in the ICA as "all of the Property of the Grantors, whether real, personal or mixed constituting or intending to constitute all of the First-Lien Collateral [or] the Second-Lien Collateral . . ." (ICA § 1.1 (A280)) "Property" is given its ordinary meaning and La Paloma is a "Grantor." (*See id.*) (A286, 290) First-Lien Collateral is defined by reference to other definitions, which, in turn, refer to the Property granted as security for the various First-Lien Obligations. (*See id.*) (A283, 285, 286) The Property pledged as First-Lien Collateral is described in the Deed of Trust and the First-Lien Security Agreement.

The Deed of Trust subjects all of La Paloma's real property to liens, and does the same for "all rents, revenues, proceeds, issues, profits, royalties, income, and other benefits now or hereafter derived from [such] Property." (Deed of Trust, 4) (A356) The First-Lien Security Agreement subjects all of La Paloma's property, defined therein as "Pledged Collateral," to a security interest. (A412, First-Lien Security Agreement, at Art. III(a)) "Pledged Collateral" includes "general intangibles . . . and accounts of [La Paloma] constituting any right to the payment of money" (*id.* at Art. III(a)(iii)) (A413) and "all [of La Paloma's] other cash, products, offspring, rents, revenues, issues, profits, payment intangibles, royalties, income" (*id.* at Art. III(a)(xi)) (A414) and all proceeds thereof (*id.*). Pledged Collateral embraces all such property, "wherever located and now owned or hereafter acquired by [La Paloma] or in which [La Paloma]

---

[16] *See* ICA, Recitals ¶¶ L, M, N, and O (A275) (reciting that various First-Lien Obligations are "secured on a first priority basis by Liens on (1) substantially all of the assets of [La Paloma] . . . and (2) all of the membership interests of [La Paloma] . . .").

6

now has or at any time in the future may acquire any right, title or interest." (*Id.* at Art. III(a)) (A412)

The ICA provides that, together with the Granting Documents and other "Collateral Documents," the parties intended that "the Liens securing the Second-Lien Obligations . . . are subject and subordinate on terms contained in [the ICA] to the Liens securing the First-Lien Obligations." (ICA, § 2.1(2)) (A295) This priority is, as a matter of contract, unaffected by "the perfection of or *avoidability of* such Liens or claims secured thereby," "any defect or deficiencies in, or failure to perfect, the Liens securing the First-Lien Obligations," or "any other circumstances whatsoever." (*Id.* at § 2.1(b)) (A297) (emphasis added) The ICA bars the Second-Lien Claimholders[17] from "contest[ing] or support[ing] any other Person in contesting, in any proceeding (including any Bankruptcy), the priority, validity or enforceability of a Lien held by or on behalf of any of any of the First-Lien Claimholders in the First-Lien Collateral." (*Id.* at § 2.2 (A298); § 3.1(b)(1)(5) (A301))

Given their subordination under the ICA, each Second-Lien Claimholder agreed not to "receive any Collateral or any proceeds of Collateral in connection with the exercise of any right or remedy . . . with respect to any Collateral in its capacity as a creditor, unless and until the Discharge of First-Lien Obligations has occurred." (*Id.* at § 3.1(c)) (A301) The Second-Lien Claimholders' "sole right" with respect to the Collateral was to "receive a share of the proceeds thereof, if any, after the Discharge of the First-Lien Obligations has occurred." (*Id.*) As such, Second-Lien Claimholders "are required to pay over all Collateral and proceeds of Collateral to

---

[17] Each member of the 2L Group is a "Second-Lien Claimholder" under the ICA.

[LNV] until the First Lien Claims are paid in full." (ICA Appeal, D.I. 14, ¶ 34) (citing ICA, §§ 2.1, 3.1, 4.1, 4.2)

## B.    Settlement and Plan

At the outset of the Chapter 11 cases, Debtors noted that some of the liens under the Granting Documents were unperfected as of the Petition Date[18] due to the Collateral Agent's failure to continue certain UCC-1 financing statements.[19] This rendered those UCC liens potentially avoidable under 11 U.S.C. § 544(a). *See, e.g.*, *In re D'Angelo*, 491 B.R. 395, 403 (E.D. Pa. 2013). Notwithstanding the UCC lapse, LNV asserted that Debtors' core assets – the Plant, associated fixtures, and their proceeds – remained subject to perfected liens under the Deed of Trust. Challenging market conditions and the regulatory environment limited Debtors' restructuring alternatives in bankruptcy. Debtors marketed their assets to potential buyers but received limited interest. LNV emerged as the most suitable purchaser of Debtors' assets, owing to its first lien position and right to credit bid its debt under § 363(k) of the Bankruptcy Code. Debtors and LNV engaged in settlement negotiations.[20] LNV reached a settlement with Debtors ("Settlement"), resolving numerous disputed issues, that was ultimately incorporated into a proposed plan of reorganization.

---

[18] *See* Plan Appeal, D.I. 30 ¶ 4.

[19] A secured creditor perfects its lien in most personal property by filing a UCC-1 financing statement. These statements expire after five years, if not continued. *See* New York UCC § 9-515(a).

[20] The ICA gave LNV exclusive authority, in its "sole discretion," to direct the "enforce[ment of] rights, exercise [of] remedies (including . . . the right to credit bid [its] debt) and . . . determinations regarding the release, disposition, or restrictions with respect to the Collateral without any consultation with or the consent of . . . any . . . Second-Lien claimholders." (ICA, § 3.1(a))

Debtors argued that they could avoid LNV's lien in personal property that was not also covered by the Deed of Trust, although Debtors recognized that LNV had defenses and that avoiding those liens would not benefit their estates if it meant LNV was unwilling to bid in cash. As part of the Settlement, LNV agreed to credit bid $150 million of its debt to buy the assets – double the highest amount indicated by a potential third-party purchaser – and to make other amounts available for unsecured creditors. In exchange for those compromises, Debtors agreed to release all avoidance actions against the Collateral Agent and preserve the liens under the Granting Documents for LNV's benefit.

As part of the Settlement, the parties identified and valued assets that may have been subject to avoidable liens. These included cash and non-cash assets, most of which were covered by the expired UCC-1 financing statement. (A73-75) (Disclosure Statement) The estimated $63.3 million value of these assets is defined in the Plan as the "Unencumbered Amount." This amount was used to allocate distributions on account of the outstanding First-Lien Obligations and the Second-Lien Obligations. The Settlement and Plan earmarked cash in an amount equivalent to the ratable share attributable to Second-Lien Obligations – approximately $30 million – to be transferred to a liquidating trust ("Liquidating Trust") for distribution in accordance with the ICA ("Subject Fund"). (*Id.*) (A73-74) That cash is referred to in the Plan as the "Remaining Cash." (Plan, § 1.87) (A778) The source of the Remaining Cash was the Debtors' own cash accounts generated from operations.[21] According to LNV, the Debtors'

---

[21] *See* Plan, § 1.87 (A778) (definition of Remaining Cash); § 1.82 (A778) (definition of Liquidating Trust Assets includes "all Remaining Cash"); § 6.2 (A794) ("On the Effective Date . . . the Liquidating Trust Assets shall be transferred *by the Debtors* . . . to the Liquidating Trust . . .") (emphasis added); *see also* Disclosure Statement, D(ii) (A75) ("Other Cash At Emergence" equivalent to "Remaining Cash"); *id.* at J (A117) (source of all Plan payments is Debtors' post-petition revenue and other cash on hand).

9

transfer of such cash was made subject to "the Liens of the Collateral Agent for the benefit of the holders of the First Lien Claims and the Second Lien Claims to the extent necessary to enforce the Intercreditor Agreement,"[22] and the funds remain "Collateral or the proceeds of Collateral"[23] notwithstanding any transfer. (ICA Appeal, D.I. 21 at 12)

2L Group was not satisfied with the Settlement negotiated by LNV under the terms of the ICA. 2L Group's claims were entirely unsecured because the value of the property subject to liens securing the First-Lien Obligations was less than the outstanding First-Lien Obligations.[24] In 2L Group's view, the Subject Fund should have been treated as unencumbered and distributed to 2L Group's members as unsecured creditors under their proofs of claim. 2L Group objected to confirmation of the Plan on several bases, including that the Settlement did not satisfy the Bankruptcy Rule 9019 standard. The Bankruptcy Court held a trial (A472, 10/30/17 Hr'g Tr.), overruled these objections, and entered the Confirmation Order (B.D.I. 869). The Plan deferred for later consideration "whether the holders of Second Lien Claims [2L Group] may receive distributions of Collateral or proceeds of Collateral (other than distributions of Second Lien Encumbered Cash) without violating the priority scheme provided for in the ICA." (Plan § 5.7(a)) Thus, the distributions that would theoretically go to 2L Group members on account of their unsecured claim (which is their entire claim) under the Plan were held in reserve with the Collateral Agent pending determination by the Bankruptcy Court as to whether the Second-Lien Lenders were entitled to such distribution in light of the ICA. (Plan § 4.4) The Plan also

---

[22] Plan, § 6.2 (A794).

[23] Plan §§ 4.4(c) (A787), 5.5 (A789-90) & 6.2 (A794).

[24] LNV received a deficiency claim of approximately $153 Million and the Second-Lien Claimholders received a deficiency claim of approximately $109 million, both of which would recover from the same pool of assets as general unsecured creditor claims.

10

provided that the ICA "shall remain in full force and effect" and "shall be fully enforceable according to its terms." (*Id.* § 5.7(a))

On November 20, 2017, 2L Group filed its appeal of the Confirmation Order. (Plan Appeal, D.I. 1). 2L Group identified as its sole issue whether the Bankruptcy Court had authority to modify the parties' rights under the ICA pursuant to the Plan. (Plan Appeal, D.I. 4 at 1) 2L Group did not seek a stay pending appeal. The Effective Date occurred and the Plan was substantially consummated on December 4, 2017 (the "Effective Date"). (A454; Plan § 13.2 (A110))

## B. ICA Decision

On December 27, 2018, the Bankruptcy Court issued the ICA Decision. The ICA Decision determined that the ICA was not ambiguous and required the Subject Fund to be paid to LNV and not to the members of 2L Group. *See La Paloma*, 595 B.R. 466. In reaching its conclusion, the Bankruptcy Court relied on § 4.2(a) of the ICA. Section 4.2(a) requires Second-Lien Claimholders to turn over to LNV any Collateral or proceeds that they receive under the conditions specified therein. The Bankruptcy Court noted that 2L Group disputed that those conditions were satisfied with respect to the Subject Fund but did not dispute that the Subject Fund constituted Collateral or proceeds thereof. *See id.* at 472. The Bankruptcy Court determined that the distribution of the Subject Fund pursuant to the Plan indeed constitutes Collateral or proceeds of Collateral. *See id.* The Bankruptcy Court then proceeded to analyze the remaining elements of § 4.2(a) that the 2L Group argued were unsatisfied, such that its members could receive Collateral or its proceeds. Finding that each of these elements was satisfied under the circumstances, the Bankruptcy Court determined that 2L Group could not receive the Subject Fund.

On January 4, 2019, 2L Group filed its appeal of the ICA Decision. (ICA Appeal, D.I. 1)

## III.  JURISDICTION

The Court has jurisdiction over all final judgments, orders, and decrees pursuant to 28 U.S.C. § 158(a)(1). In conducting its review of the issues on appeal, this Court reviews the Bankruptcy Court's findings of fact for clear error and exercises plenary review over questions of law. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.,* 197 F.3d 76, 80 (3d Cir. 1999). The Court must "break down mixed questions of law and fact, applying the appropriate standard to each component." *Meridian Bank v. Alten*, 958 F.2d 1226, 1229 (3d Cir. 1992).

## IV.  CONTENTIONS

### A.  Motions to Dismiss

LNV moves to dismiss the appeals as moot pursuant the doctrine of equitable mootness and § 363(m) of the Bankruptcy Code. With respect to equitable mootness, LNV argues that no review of the ICA Decision is permissible because the 2L's Group's requested relief would upset the terms of the Debtors' substantially consummated Plan. (ICA Appeal, D.I. 12 at 13-19) According to LNV, the Plan embodies a comprehensive settlement between LNV, the Debtors, and the Official Committee of Unsecured Creditors appointed in the Chapter 11 cases. This settlement was "the heart of" Plan and, in exchange for many concessions from LNV, the Debtors agreed to release all avoidance actions against the Collateral Agent under the Granting Documents, meaning that all liens of the Collateral Agent were preserved for the benefit of LNV and would be "valid, binding, and unavoidable." (*Id.*) (citing A87, Plan § 5.5) The Debtors further agreed that any distributions payable to Second Lien Claimholders from the $30 million Subject Fund would be and remain "Collateral or the proceeds of Collateral." According to LNV, 2L Group's appeals could only succeed if the Debtors' estates held unencumbered cash

not subject to the ICA, and according to LNV, no such assets exist. Granting any relief to 2L Group would fatally scramble the Plan, invalidating the releases granted, liens preserved, and collateral determinations made in the Plan as part of the Settlement, and 2L Group's appeals should be dismissed as equitably moot.

2L Group, of course, disagrees. 2L Group argues that the ICA Decision merely addressed a bilateral dispute over escrowed funds expressly contemplated by the Plan. As such, reversal of the ICA Decision would not even modify – let alone "fatally scramble" – the Plan or harm third parties. (ICA Appeal, D.I. 17 at 6-11)

With respect to statutory mootness under § 363(m), LNV contends that 2L Group did not obtain a stay of the Confirmation Order and argues that the relief sought in the appeals threatens the validity of the sale. (ICA Appeal, D.I. 12 at 19-21) According to LNV, the sale to LNV was inseparable from the Settlement, as LNV was only able to credit bid for the Debtors' assets as a consequence of the Settlement preserving all liens under the Granting Documents; likewise, the amount of its credit bid was a key settlement term. LNV contends that invalidating the avoidance actions releases and liens would impact the validity of the sale as it would erode the value of the consideration that LNV received in the transaction. (*Id.* at 20-21)

Again, 2L Group disagrees, arguing that LNV's argument under § 363(m) fails for the same reasons its equitable mootness argument fails. (ICA Appeal, D.I. 17 at 11) The sale cannot moot the appeals, according to 2L Group, because 2L Group does not seek to interfere with the sale any more than it seeks to interfere with the Settlement, which preserved the Intercreditor Dispute for later determination and escrowed the funds at issue. Moreover, 2L Group argues, even if the Court were to construe the Subject Fund as proceeds of the sale,

§ 363(m) preserves the validity of the sale and does not address the disposition of the proceeds of a sale. (*Id.*)

## B. Merits

2L Group argues that the ICA Decision must be reversed because: (i) the filing of a proof of claim was not the exercise of a right or remedy in contravention of the ICA, since the ICA expressly permits such an action; (ii) the Subject Fund is not Collateral or "intended" to be Collateral under the ICA, since it is comprised entirely of Avoidance Proceeds, which cannot be Collateral or "intended" to be Collateral under the ICA, since such avoidance actions are not property of the Debtors; and (iii) the ICA provides for only lien subordination and not payment subordination.

LNV responds that 2L Group has completely changed its legal strategy. (ICA Appeal, D.I. 21 at 16) According to LNV, 2L Group argued to the Bankruptcy Court that it could receive the Subject Fund, even if the fund constituted Collateral, because some of the other conditions of ICA Section 4.2(a) had not been met. (*Id.*) (citing B.D.I. 695, ¶¶ 16-24 (A226-30)) On appeal, however, 2L Group concedes that it cannot receive the Subject Fund if it is Collateral but argues that the Subject Fund is not Collateral because it constitutes the proceeds of an avoidance action. (ICA Appeal, D.I. 14 at ¶¶ 20-31) LNV argues that 2L Group's approach narrows, if not eliminates, the issues in the appeals, "as the plain terms of the ICA and the Plan make clear that the Subject Fund constitutes Collateral." (*Id.*) As such, LNV contends, the Subject Fund cannot be paid to 2L Group, and the ICA Order should be affirmed.

## V.    DISCUSSION

### A.    Equitable Mootness

Equitable mootness is a judge-made abstention doctrine which can be applicable in the context of an appeal following the confirmation of a plan of reorganization by a bankruptcy court. *See In re SemCrude*, 728 F.3d 314, 317 (3d Cir. 2013). "Once effective, reorganizations typically implement complex transactions requiring significant financial investment." *Id.* Notwithstanding an aggrieved party's statutory right to appeal, and a federal court's "virtually unflagging obligation" to exercise the jurisdiction conferred on it, *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), in some circumstances granting the relief requested in the appeal "would disrupt the effected plan or harm third parties," *SemCrude*, 728 F.3d at 317.

Parties seeking to dismiss an appeal as equitably moot contend that "even if the implemented plan is imperfect, granting the relief requested [in the appeal] would cause more harm than good." *Id.* In light of the responsibility of federal courts to exercise their jurisdictional mandate, the Third Circuit has cautioned that an appellate court must "proceed most carefully before dismissing an appeal as equitably moot." *Id.* at 318. "Before there is a basis to forgo jurisdiction, granting relief on appeal must be almost certain to produce a perverse outcome – chaos in the bankruptcy court from a plan in tatters and/or significant injury to third parties. Only then is equitable mootness a valid consideration." *Id.* at 320 (internal citations and quotation marks omitted).

To determine whether to dismiss an appeal of a bankruptcy order as equitably moot, the court undertakes a two-step inquiry. *See In re Tribune Media Co.*, 799 F.3d 272, 278 (3d Cir. 2015). The Court must assess: "(1) whether a confirmed plan has been substantially

15

consummated; and (2) if so, whether granting the relief requested in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have justifiably relied on plan confirmation." *SemCrude*, 728 F.3d at 321.

LNV, as the party seeking dismissal of the appeal on equitable mootness grounds, bears the burden of proving that, weighing these factors, dismissal is warranted. *See id.* Because dismissal of an appeal over which the Court has jurisdiction "should be the rare exception and not the rule," any such dismissal must "also be based on an evidentiary record, and not speculation." *Id.*

### 1. Substantial Consummation

Substantial consummation is defined in the Bankruptcy Code to mean the:

(A) transfer of all or substantially all of the property proposed by the plan to be transferred;

(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

(C) commencement of distribution under the plan.

11 U.S.C. § 1101(2). "Satisfaction of this statutory standard indicates that implementation of the plan has progressed to the point that turning back may be imprudent." *SemCrude*, 728 F.3d at 321. Neither party disputes that the Plan is substantially consummated, and the record supports this finding.

### 2. Success of the Plan and Harm to Third Parties

"If [the substantial consummation] threshold is satisfied, a court should continue to the next step in the analysis. It should look to whether granting relief will require undoing the plan as opposed to modifying it in a manner that does not cause its collapse." *SemCrude*, 728 F.3d at 321. "It should also consider the extent that a successful appeal, by altering the plan or

otherwise, will harm third parties who have acted reasonably in reliance on the finality of plan confirmation." *Id.* (citations omitted).

LNV argues that the appeals should be dismissed as moot "so as not to disturb the complex and comprehensive Settlement embodied in the Plan." (ICA Appeal, D.I. 12 at 13) As part of the Settlement, LNV argues, all liens in favor of the Collateral Agent were preserved as "valid, binding, and unavoidable" and the Subject Fund remains "Collateral or the proceeds of Collateral." LNV argues that this was one "get" that LNV got in exchange for a myriad of "gives." *Id.* According to LNV, 2L Group seeks to deprive LNV of its bargain at a time when the rest of the deal cannot be undone. To grant 2L Group any relief in connection with the appeals, then, would unravel the comprehensive Settlement at the heart of the Plan.

2L Group argues that the relief sought by the appeals would not even *modify* – let alone "scramble" – the Plan. (ICA Appeal, D.I. 17 at 6) According to 2L Group, neither the Settlement nor the Plan purported to resolve the dispute between LNV and 2L Group over what value, if any, the ICA permitted 2L Group to recover from the Debtors' estate as unsecured creditors. (*Id.* at 1) 2L Group points to language in the Disclosure Statement[25] and relevant provisions of the Plan[26] indicating that those documents are substantively neutral on the issue, as

---

[25] Section § II.E.(ii) of the Disclosure Statement (A40) provides:

> The Debtors do not intend for the Plan mechanics or defined terms used in the Plan to have any substantive impact on the dispute between the holders of First Lien Claims and the holders of Second Lien Claims as to whether the holders of Second Lien Claims are permitted to receive distributions under the Plan in accordance with the Intercreditor Agreement. The Debtors believe that the Plan is neutral and properly preserves all rights and arguments with respect to this dispute.

[26] Section 5.7 of the Plan provides, in relevant part:

17

the Plan expressly deferred the Bankruptcy Court's resolution of this Intercreditor Dispute and expressly reserved the $30 million Subject Fund to be paid to the prevailing party. 2L Group argues that its pursuit of bilateral litigation, which the Plan explicitly left undecided and separately funded, cannot upset the Plan or any party's reliance on its terms and, so, cannot be construed as "fatally scrambling" the Plan.

2L Group finds strong support for its position in the *Tribune* case, as both questions of equitable mootness addressed there by the Third Circuit are, in 2L Group's view, determinative here. (*See* D.I. 17 at 8-9) (citing *Tribune,* 799 F.3d at 278-83) In *Tribune*, the Third Circuit held that (1) certain noteholders' appeal, "which seeks to undo the crucial component [i.e., a settlement of avoidance claims] of the now consummated plan, should be deemed [equitably]

---

(a) The Intercreditor Agreement shall remain in full force and effect notwithstanding the confirmation of the Plan or the occurrence of the Effective Date and shall be fully enforceable according to its terms. The Bankruptcy Court or other court of competent jurisdiction shall determine by Final Order whether the holders of Second Lien Claims may receive distributions of Collateral or proceeds of Collateral (other than distributions of Second Lien Encumbered Cash) without violating the priority scheme provided for in the Intercreditor Agreement notwithstanding any lapses of perfection or the potential avoidability of the Liens upon the Collateral. No distribution to holders of Second Lien Claims (including on account of the Liquidating Trust Interests), other than distribution of the Second Lien Encumbered Cash, shall be made absent a Final Order of the Bankruptcy Court or other court of competent jurisdiction finding that the holders of Second Lien Claims may receive such distributions without violating the priority scheme set forth in the Intercreditor Agreement.

(b) Any distributions to holders of Second Lien Claims constituting Collateral or proceeds of Collateral (including all distributions on account of Liquidating Trust Interests), other than distributions of Second Lien Encumbered Cash, shall be made by the Disbursing Agent to the Collateral Agent, and, notwithstanding anything to the contrary in the Intercreditor Agreement, the Collateral Agent shall hold such distributions in reserve pending the determination set forth in Section 5.7(a) above. The Collateral Agent shall distribute such funds as provided by agreement of the holders of the First Lien Claims and the holders of Second Lien Claims, or as directed by Final Order.

moot," but that (ii) certain Trustees' appeal, "seek[ing] disgorgement from other creditors of $30 million that Trustees believe they are contractually entitled to receive . . . is not equitably moot." *Tribune*, 799 F.3d at 274. 2L Group argues that it is unlike the noteholders in *Tribune* – whose claims were equitably moot – but like the Trustees in *Tribune* – whose claims were not equitably moot – because, in 2L Group's appeals, "[o]ther third parties will not be harmed, nor is the Plan even remotely called into question." *Id.* at 284.

The Court agrees with 2L Group's application of *Tribune* here. In *Tribune*, the noteholders' appeal of the settlement was deemed equitably moot because the appellants sought "modification of the confirmation order to reinstate" certain claims against the debtors' former lenders, directors, and officers "that the Settlement had resolved[,] so that the claims can be fully litigated." *Id.* at 277. Here, by contrast, 2L Group is not seeking to "reinstate" claims that the Plan "resolved." Rather, 2L Group is continuing to litigate a claim that the Plan expressly left unresolved.

Additionally, in *Tribune*, the Trustees' appeal was not equitably moot, for reasons whose application here leads to the same conclusion. In that case, the Trustees in Class 1E "contend[ed] that they [were] beneficiaries of a subordination agreement that guarantees that they will receive any recovery that goes to the holders of [certain notes] ahead of a class of trade and other creditors (Class 1F)." *Id.* at 282. The Third Circuit determined that, to the extent Class 1F had already received the disputed distributions, "disgorgement could be ordered against those Class 1F holders who have received more than their fair share." *Id.* at 282-83. The Third Circuit held that the Trustees' appeal did not seek to scramble the plan; "[n]or, if the Trustees rightly read the subordination agreement, has anyone 'justifiably relied,' . . . on the finality of the confirmation order with respect to the $30 million." *Id.* at 283 (citing *SemCrude*, 728 F.3d at

321). "It would be *unfortunate* from the prospective of the [appellees] to require disgorgement, but, if they were never entitled to that money in the first place, it was not *unfair*, and mootness must be fair (equitable in legalese) to be invoked." *Id.* (emphasis in original). "Other third parties will not be harmed, nor is the Plan even remotely called into question." *Id.* at 284.

Likewise, here, the Intercreditor Dispute is about whether 2L Group's right to $30 million in distributions as unsecured creditors under the Plan is contractually subordinated to LNV's priority right to proceeds of Collateral under the ICA. As in *Tribune*, this bilateral intercreditor dispute has "no chance" of "unravel[ling] the Plan." *Id.* at 283. Also, as in *Tribune*, if 2L Group "rightly read the subordination agreement," LNV cannot argue that it "justifiably relied" upon the Plan to provide otherwise. *Id.* Further, as 2L Group points out, while in *Tribune* the Third Circuit permitted an appeal that sought disgorgement of funds already distributed, here the $30 million Subject Fund has not been distributed. (*See* Plan § 5.7(b))

The Court agrees with 2L Group that the appeals are not equitably moot, and the Court "finds no prudent reason to forbear from deciding the merits of the [] appeal[s]." *Tribune,* 799 F.3d at 282.

### B. Statutory Mootness Pursuant to § 363(m)

Section 363(m) of the Bankruptcy Code shields from appellate review orders approving good faith sales of estate property:

> The reversal or modification on appeal of an authorization . . . of a sale . . . does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith . . . unless such authorization and such sale . . . w[as] stayed pending appeal.

11 U.S.C. § 363(m). LNV argues that the Bankruptcy Court approved the sale of the Debtors' assets under § 363 as part of the Settlement and made all findings necessary for § 363(m) to

apply.[27]  (*See* ICA Appeal, D.I. 12 at 19-20)  "The sale itself was 'a key component' of the Settlement and the Bankruptcy Court separately found the Settlement, including LNV's credit bid amount for the Debtors' assets, was made in good faith."[28]  LNV further argues that, "[w]here the good faith requirement is met, any appellate challenge to a § 363 transaction must be rejected as moot if two conditions are satisfied: first, the underlying transaction was not stayed pending the appeal; and second, the requested reversal or modification of the order authorizing the transaction would affect 'the validity of such sale.'"  *Id.* (citing *In re Pursuit Capital Mgmt. Fund I*, 874 F.3d 124, 135 (3d Cir. 2017))  LNV adds that where, as here, no stay was obtained, "any reasonably close question about the applicability of § 363(m) should be answered in favor of applicability."  *Id.* at 20 (citing *Pursuit Capital,* 874 F.3d at 143).  It follows, according to LNV, that establishing that reversal will not affect the validity of a sale is a "high bar" and, absent a stay, mootness will be avoided only in a "rare case."  *Id.* at 138.  Indeed, § 363(m) only permits challenges "that are so divorced from the overall transaction that the challenged provision would have affected none of the considerations on which the purchaser relied."  *Id.* at 139.

LNV continues by arguing that "the sale and the Settlement are inseparable."  (ICA Appeal, D.I. 12 at 20)  "LNV was able to credit bid for the Debtors' asset package only as a consequence of the Settlement preserving all liens under the Granting Documents; likewise, the

---

[27] *See* Confirmation Order, ¶ 38 (A28) ("Purchaser is a good faith buyer within the meaning of [§363(m)], and is therefore entitled to the full protection of that section under this Confirmation Order . . . and has otherwise proceeded in good faith in all respects in connection with this proceeding.").

[28] Confirmation Order at ¶¶ 37, 34 (A27-28, 25)

amount of its credit bid was a key settlement term."[29] According to LNV, invalidating the

avoidance action releases and liens would impact "the validity of the sale," as it would be

contrary to the very premise of the credit bid and "erode the value of the consideration LNV

received in the transaction." (*Id.*)

To 2L Group, LNV is wrong for essentially the same reasons it was wrong on equitable

mootness. 2L Group contends that the sale cannot moot the appeals because 2L Group does not

seek to interfere with the sale any more than it seeks to interfere with the Settlement. (ICA

Appeal, D.I. 17 at 11) Moreover, even were the Court to construe the Subject Fund as proceeds

of the sale, "a live controversy about who should get the money generated by the sale [of a

bankruptcy debtor's assets under section 363(m)] . . . does not concern mootness." *Id.* (citing

*Trinity 83 Dev., LLC v. ColFin Midwest Funding, LLC*, 917 F.3d 599, 602 (7th Cir. Mar. 1,

2019)). 2L Group argues that § 363(m) by its terms preserves only "the validity of [the] sale,"

which 2L Group does not contest. "Section 363(m) does not say one word about the disposition

of the proceeds of a sale or lease." *Trinity* 83, 2019 WL 987902, at *2 (collecting cases).

The Court concludes that 2L Group's pursuit of the Intercreditor Dispute (now, the

appeals) will not impact the validity of the sale. LNV's argument under § 363(m) is

unpersuasive. The Settlement embodied in the Plan – which LNV argues is "inseparable from

the sale" – did not resolve the Intercreditor Dispute. Rather, the Plan expressly preserved the

Intercreditor Dispute to be resolved separately and segregated the Subject Fund pending the later

resolution of that dispute. The Disclosure Statement also confirmed that the Plan was "neutral

and properly preserves all rights and arguments in connection with this dispute." (A40,

---

[29] *See La Paloma*, 595 B.R. at 470 ("The[] [Settlement] issues include (i) the amount of LNV's
credit bid and secured claim, (ii) the extent to which the assets to be sold are subject to a
perfected lien and (iii) the extent to which the [Subject Fund] is subject to a perfected lien.").

Disclosure Statement, § II.E(ii)) The Plan clearly contemplated the possibility that the Bankruptcy Court could determine the Intercreditor Dispute in 2L Group's favor. LNV's credit bid and other consideration given in the sale were not dependent on the outcome of the Intercreditor Dispute.

Thus, under the facts here, § 363(m) does not bar review of the ICA Decision.

## C.    Merits

Having determined that the appeals should not be dismissed on the basis of either statutory mootness or equitable mootness, the Court turns to the merits of 2L Group's appeals.

### 1.    Plan Appeal

As of the date of the confirmation hearing, on October 30, 2017, 2L Group and LNV had separately filed – but the Bankruptcy Court had not yet heard – the summary judgment motions concerning the Intercreditor Dispute. The issues on appeal arise from the ICA Decision, issued a year later, on December 27, 2018.

As noted in the briefing, the essential dispute in this matter is between 2L Group and LNV. 2L Group filed the Plan Appeal "solely to prevent a two-step argument from LNV that it should prevail in the Intercreditor Dispute because (a) the Plan governs the outcome there and (b) [2L Group] did not appeal confirmation of the Plan." (Plan Appeal, D.I. 30 at 5; *see also* ICA Appeal, D.I. 14 at 6, ¶ 10) 2L Group asserts that the Plan Appeal does not seek to undo any element of the Settlement or the Plan, assuming both are read to preserve 2L Group's rights as against LNV under the ICA and the Plan does not purport to modify the ICA. It is 2L Group's position that the Confirmation Order should be reversed solely to the extent that the Plan purports to modify 2L Group's rights, LNV's rights, the definition of "Collateral," or any other aspect of the ICA. (Plan Appeal, D.I. 30 at 8)

As discussed below, the Court concludes that the Plan does not purport to modify the ICA,[30] and the Bankruptcy Court decided the Intercreditor Dispute in accordance with the ICA. Accordingly, the Court will affirm the Confirmation Order.

## 2. ICA Appeal

Under the Settlement, LNV was allowed a deficiency claim of approximately $153 million, which recovers *pari passu* with 2L Group's allowed deficiency claim of approximately $109 million. (Plan §§ 1.51; 1.92, 6.4; Disclosure Statement § II.D.(ii)) Pursuant to the Plan, LNV funded payment in full to all other unsecured creditors. (Disclosure Statement § II.D.(ii)) Accordingly, LNV and 2L Group are essentially the only unsecured creditors recovering from the Liquidating Trust.

It appears to be undisputed that 2L Group's allowed claim entitles it to *pari passu* distributions from the Liquidating Trust. The dispute is whether 2L Group must then turn over that recovery to LNV in accordance with the ICA. The Plan preserved the parties' arguments concerning the effect of the ICA on the ultimate disposition of 2L Group's distributions under the Plan.

On October 5, 2017, 2L Group filed the 2L Motion, and on October 16, 2017, LNV filed the 1L Motion relating to the same controversy. LNV asserted that under the terms of the ICA, "all principal and other amounts" payable to LNV in respect of the First-Lien Obligations must be paid in full before 2L Group would be allowed to receive any recovery on account of the

---

[30] The Plan expressly provides, "The Intercreditor Agreement shall remain in full force and effect notwithstanding the confirmation of the Plan or the occurrence of the Effective Date and shall be fully enforceable according to its terms. (Plan § 5.7(a)) This is consistent with Bankruptcy Code § 510(a), which provides, "A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a).

24

Second Lien Obligations. 2L Group asserted that because the First Liens lapsed prior to the Petition Date, all money should be distributed in accordance with the Plan, which includes to 2L Group, pursuant to its proof of claim. Neither party alleged that the ICA was ambiguous; rather, each party relied on its own "plain reading" in reaching competing results.

The Bankruptcy Court heard oral argument on November 6, 2017 and took the matter under advisement. (B.D.I. 871) On December 27, 2018, the Bankruptcy Court issued the ICA Decision. The Bankruptcy Court's analysis centered on § 4.2(a) of the ICA,[31] which provides that in order for LNV to enforce the ICA and require 2L Group to turn over to LNV the distributions it received under the Plan, LNV must show that each of this section's four elements are satisfied:

(i)     The distribution must be "Collateral or proceeds thereof;"

(ii)    The distribution must be received "in connection with the exercise of any right or remedy" by the Second-Lien Claimholders;

(iii)   Any such exercise of a right or remedy must "relat[e] to the Collateral;" and

(iv)    The exercise of such right or remedy must be "in contravention of this [Intercreditor] Agreement."

---

[31] Section 4.2 of the ICA provides:

> Payments Over. (a) So long as the Discharge of First-Lien Obligations has not occurred, whether or not any Bankruptcy has been commenced by or against La Paloma or any other Grantor, *any Collateral or proceeds thereof* (including assets or proceedings subject to Liens referred to in the final sentence of Section 2.3) received by Second-Lien Administrative Agent, the MS Counterpart, any other Second-Lien Claimholder, or any Third-Lien Claimholder *in connection with the exercise of any right or remedy (including set-off) by the Collateral Agent or any such Person relating to the Collateral in contravention of this Agreement* shall be segregated and held in trust and forthwith paid over to the Collateral Agreement (for the benefit of the First-Lien Claimholders) . . . .

(ICA, § 4.2(a) (emphasis added))

*La Paloma*, 595 B.R. at 471. The Bankruptcy Court ultimately determined that all four elements were satisfied.

On appeal, 2L Group argues that the Bankruptcy Court erred because (i) the unsecured distribution is not Collateral or "intend[ed]" to be Collateral under the ICA; (ii) 2L Group's filing of a proof of claim was not the exercise of a right or remedy in contravention of the ICA; and (iii) the ICA provides for lien subordination, not payment subordination. (*See* ICA Appeal, D.I. 14 at 7-19)

### a.    Collateral or Proceeds Thereof

2L Group asserts that the Bankruptcy Court erred in concluding that the Subject Fund is Collateral or proceeds thereof. (ICA Appeal, D.I. 14 at 11-12)

As an initial matter, the Court agrees with LNV that 2L Group has waived this argument, having failed to include it in its briefing before the Bankruptcy Court and having raised it for the first time at oral argument. (*See* ICA Appeal, D.I. 21 at 25-28) The record supports LNV's waiver argument. (*See* B.D.I. 695, 834 (briefing in support of 2L Motion failing to raise argument); B.D.I. 847, ¶ 10 (one sentence response to collateral assertion in 1L Motion); 11/7/2017 Hr'g Tr., 36:6-16 (A854) (2L Group's counsel: "I simply think the problem [LNV] ha[s] . . . is that this is the proceeds of an avoidance action, and an avoidance action can't be part of prepetition collateral. It's – I mean, if Your Honor wants, I mean we've got, I don't know, I've got half a dozen cases that I can cite to you that say that, but we didn't think that was necessary because we all do this.") The ICA Decision notes: "The [2L Group] assert[s], without argument, that there *has* to be unencumbered assets. However, without argument or reference to the documentation regarding such unencumbered assets, the Court is hard-pressed to find that such a broad definition of 'Collateral' does not include substantially all of the assets of the

26

Debtors."). *La Paloma*, 595 B.R. at 472. As LNV correctly points out, the Bankruptcy Court

had no obligation to consider an argument raised for the first time at oral argument, *In re Corio*,

371 Fed. App'x 352, 355 (3d Cir. 2010), or which was not otherwise raised in the proponent's

principal brief, *see In re Paul J. Paradise & Assocs.*, 249 B.R. 360, 364 n.15 (D. Del. 2000).

Likewise, this Court has no obligation to consider an argument not properly raised in the

Bankruptcy Court. *Id.* (citing *In re Grand Union Co.*, 200 B.R. 101, 106 (D. Del. 1996)).

 Even if 2L Group had not waived its argument with respect to Collateral, that argument

must be rejected. To determine whether distributions under the Plan would be "Collateral or

proceeds thereof," the Bankruptcy Court looked to § 1.2 of the ICA, which defines "Collateral"

as "all of the Property of any Grantor, whether real, personal, mixed, constituting or intending to

constitute all of the First-Lien Collateral, the Second-Lien Collateral or the Third-Lien

Collateral." *La Paloma,* 595 B.R. at 482. The Bankruptcy Court noted that § 2.1(b) of the ICA

clarifies that the First-Lien Lenders' priority over the Second-Lien Lenders in Collateral is not

affected by any issue concerning "(iii) the perfection of or avoidability of such liens or claims

secured [by the First-Lien Security Agreement or] . . . (vi) any defect or deficiencies in, or failure

to perfect, the Liens securing the First-Lien Obligations." *Id.* "Thus, the prepetition lapse of the

First Lien Holders' claims does not give rise to issues between and among the First-Lien and

Second-Lien Lenders." *Id.*

 Based on these provisions, the Bankruptcy Court was "hard-pressed" to find that such a

broad definition of 'Collateral' does not include substantially all of the assets of the Debtors."

*Id.* The Bankruptcy Court noted that "[s]ubstantially all of the Debtors' assets were sold

pursuant to the Plan" to LNV – "whether or not [those assets were] subject to a validly perfected

security interest" – and that the sale proceeds were distributed as part of the Confirmed Plan."

*Id.* & n.25. "Intuitively, there are no truer definition[s] of 'proceeds of Collateral' other than the proceeds from the sale of that Collateral." *Id.* (citing *Aircraft Trading Servs., Inc. v. Braniff, Inc.*, 819 F.2d 1227, 1233 (2d Cir. 1987)). Hence, the Bankruptcy Court found that "distributions pursuant to the Plan are 'Collateral or proceeds thereof.'" *Id.*

2L Group contends this finding is erroneous. 2L Group asserts that the Settlement embodied in the Plan had two major features – "Sale of the Acquired Assets" and the "First Lien Settlement." (ICA Appeal, D.I. 14 at 11) According to 2L Group, the "Sale of Acquired Assets" feature provides that, "in exchange for a credit bid by LNV of $150 million in satisfaction of its First Lien Claim, LNV will acquire the Acquired Assets," while the "First Lien Settlement" feature provides that, in exchange for the extinguishment of the Lien Avoidance Claim, "the Debtors' estate[s] received the Avoidance Proceeds, constituting $63.3 million of unencumbered cash to be used, after payment of certain allowed administrative, priority and other secured claims, to fund a liquidating trust for general unsecured creditors . . ." (*Id.* at 5) 2L Group asserts that "[t]he Bankruptcy Court erred in focusing on the Sale of the Acquired Assets to the exclusion of the First Lien Settlement and concluding that there were no unencumbered assets to be distributed under the Plan." (*Id.* at 11)

"Avoidance Proceeds" is a term not used in the ICA, Plan, or any other relevant document; rather, it is a term 2L Group employed in its statement of issues. (*See* ICA Appeal, D.I. 14 at 1) The Plan does not support 2L Group's argument that the Subject Fund constitutes proceeds of an avoidance action. Rather, as LNV correctly contends, the $63.3 million was not an amount "paid" in exchange for release of the avoidance claims. Instead, this amount is

referred to in the Plan as the "Unencumbered Amount,"[32] and it reflected the estimated value of the pool of assets – cash and non-cash – as to which the Debtors and LNV acknowledged *a dispute* concerning the perfection of the Collateral Agent's lien.[33] Among these assets was an estimated $31.3 million in cash,[34] which consisted overwhelmingly of post-petition revenue.[35] Under the Plan, the Debtors transferred the non-cash items constituting the Unencumbered Amount to LNV, as well as certain cash.[36] The Debtors then transferred the rest of their cash to the Liquidating Trust (which now constitutes the Subject Fund). This cash is defined in the Plan as the "Remaining Cash."[37] The "Remaining Cash" was cash remaining in the Debtors' operating account[38] on the Effective Date. It was not paid by anyone to settle an avoidance action and is not the proceeds of an avoidance action. Rather, it is the proceeds of the Debtors'

---

[32] Plan, § 1.101 (A780). 2L Group misread the defined term in the Plan as "Unencumbered Assets" and then used it throughout its brief. (*See* D.I. 14, ¶ 13) ("The Bankruptcy Court also erred in finding that the Avoidance Proceeds (fittingly labeled as "Unencumbered Assets" under the Plan) . . . .").

[33] *See* Disclosure Statement, D.(ii) (A73). Importantly, the assets used in calculating the Unencumbered Amount were never actually "unencumbered." There was merely a dispute regarding the avoidability of the lien in those assets. *Id.* This dispute was terminated when the avoidance actions were released and the lien preserved. (Plan, § 5.5)

[34] *See* A75 (Disclosure Statement, D.(ii)) (listed as "Other Cash at Emergence").

[35] *See id.* (A73); *see also id.* at J. (A117) ("The Debtors anticipate having sufficient Postpetition Revenue and other Cash on hand to make all required payments under the Plan and will otherwise satisfy their obligations thereunder."); *id.* at Ex. D, 8 (A216) (alternative liquidation scenario analysis identifying $38.850 million in "Unencumbered Cash" as "Postpetition Revenue"); 10/30/2017 Hr'g Tr. at 80 (A551), 107 (A578), 113 (A584), 142 (A613), 154-55 (A625-26).

[36] Disclosure Statement, D.(ii) (A73-74).

[37] Plan, § 1.87 (A778).

[38] This same cash is identified as the "Other Cash at Emergence" in section D.(ii) of the Disclosure Statement. (A75)

business operations – the Debtors' "cash," "revenues," "profits," and proceeds of "accounts," that are expressly made security for the First-Lien Obligations under the First-Lien Security Agreement and, therefore, constitute "Collateral" or its proceeds under the ICA.

2L Group's Avoidance Proceeds arguments are also incompatible with the terms of the ICA. The core of 2L Group's argument is that the UCC-1 lapse, the Debtors' bankruptcy filing, the resulting availability of avoidance actions, and ultimate settlement of avoidance claims makes the Subject Fund proceeds of an avoidance action, which cannot be subject to a lien as a matter of law. (*See* ICA Appeal, D.I. 14, ¶¶ 20-28) But as LNV correctly observes, none of these circumstances changes the fact that the parties agreed that the Subject Fund would be Collateral as between them by virtue of it being security under the First-Lien Security Agreement. The definition of "Collateral" extending to property "intend[ed]" to constitute security for the First-Lien Obligations can serve only one purpose: to preserve the parties' respective rights and priorities even when the property is not actually subject to a perfected or enforceable security interest.

Other provisions of the ICA confirm this. Section 2.1(b) of the ICA provides that "notwithstanding . . . the perfection or avoidability of such Liens or claims secured thereby, . . . any provision of the UCC, . . . any other Legal Requirement, . . . any defect or deficiencies in, or failure to perfect, the Liens securing the First-Lien Obligations or . . . any other circumstances whatsoever," the priority of the parties' interest in the Collateral will be unaffected. The ICA prohibits 2L Group from circumventing the ICA's priority scheme due to any defects in LNV's liens.

The Bankruptcy Court's finding that the Subject Fund is Collateral is supported by the record, including the Granting Documents, the ICA, the Disclosure Statement, and the evidence

and argument presented at the confirmation hearing. 2L Group misreads the Plan. The record does not support its argument that there were unencumbered assets by virtue of the settlement of the avoidance claim or that the Bankruptcy Court erred in finding that the Subject Fund constitutes Collateral under the ICA.

Finding no error in the Bankruptcy Court's determination that the Subject Fund is Collateral under the ICA, and based on 2L Group's concession that there is "no dispute that the 2L Lenders are required to pay over all Collateral and proceeds of Collateral to Appellee until the First Lien Claims are paid in full" (D.I. 14 at 16, ¶ 34), the Court may affirm the ICA Decision on this basis alone. Nonetheless, the Court will address 2L Group's remaining arguments.

**b.    Exercise of a Right or Remedy in Contravention of the ICA**

2L Group argues that the Bankruptcy Court erred in its determinations that (i) filing a proof of claim is an exercise of remedies; and (ii) payment on that proof of claim would contravene the ICA. (ICA Appeal, D.I. 14 at 9-10)

The Bankruptcy Court concluded that filing a proof of claim was an exercise of remedies because the right to do so was specifically carved out from the general prohibition on members of 2L Group exercising remedies. *See La Paloma*, 595 B.R. at 473-74. Section 3.1 of the ICA, entitled "Exercise of Remedies," governs what remedies a junior creditor may and may not exercise. Sub-sections (a) and (b) each contain provisions limiting the exercise of remedies by Second-Lien Claimholders before the First-Lien Obligations are fully satisfied. (ICA § 3.1(a), (b)) (A299-301) Subsection (k) sets forth exceptions to the general prohibition: "[n]otwithstanding the foregoing, the [2L Group's members] may . . . file a claim or statement of interest in a Bankruptcy of La Paloma or any other Grantor . . . ." (*Id.* at § 3.1(k)) (A305)

Applying the interpretative rules that the specific controls over the general, and that no term should be rendered meaningless, the Bankruptcy Court found that filing a proof of claim was an exercise of remedies. *See La Paloma*, 595 B.R. at 472-74.

The Bankruptcy Court's conclusion is well-reasoned. As LNV correctly points out, if filing a proof of claim were ***not*** an exercise of remedies, then there would be no reason to carve out an authorization to file a proof of claim from the general prohibition on exercising remedies. In reaching this conclusion, the Bankruptcy Court applied traditional rules of contract interpretation and committed no error.

The Bankruptcy Court also concluded that receiving payment on account of the filed proof of claim would contravene the ICA. *See La Paloma*, 595 B.R. at 474. This is because the Bankruptcy Court found that the distributions on the proof of claim would constitute Collateral or proceeds of Collateral which, under § 3.1(c) of the ICA, 2L Group's members cannot receive until LNV has been paid in full. *See id.* The Court agrees with this conclusion as well.

Section 3.1(c) provides, in relevant part, as follows:

> [E]ach Second-Lien Claimholder agrees that it will not take or receive any Collateral or any proceeds of Collateral in connection with the exercise of any right or remedy . . . with respect to any Collateral in its capacity as a creditor, unless and until the Discharge of First-Lien Obligations has occurred.

Thus, § 3.1(c) forbids members of 2L Group from (i) taking or receiving proceeds of Collateral (ii) in connection with their exercise of rights with respect to Collateral as creditors (iii) so long as First-Lien Obligations remain outstanding. As LNV correctly argues, with elements (i) and (iii) undisputed by 2L Group in the Bankruptcy Court, the Bankruptcy Court needed only to find element (ii) satisfied in order to conclude that § 3.1(c) bars the Second-Lien Claimholders from receiving the Subject Fund.

The Court agrees that 2L Group's members, in seeking payment on their claims, are exercising rights as creditors. Payment on a claim is a right "with respect to" Collateral within the meaning of the ICA where the payment would constitute proceeds of Collateral. As Section 3.1(c) provides: "**[***T***]***he sole right*** of . . . any Second-Lien Claimholders *** with respect to the Collateral is . . . to receive a share of the proceeds thereof***, if any, after the Discharge of the First-Lien Obligations has occurred." (ICA § 3.1(c)) (emphasis added) Thus, § 3.1(c) clearly designates "receiv[ing] . . . proceeds" of Collateral as a "right . . . with respect to the Collateral," and prohibits 2L Group from exercising such right until LNV is fully paid.

2L Group complains the Bankruptcy Court's analysis compels the anomalous result that its members would have been allowed their desired distribution had they relied solely on their scheduled claim, but must be denied distributions because they filed a proof of claim. (ICA Appeal, D.I. 14, ¶¶ 16-17) The Court agrees with LNV that this argument must also be rejected.

The Bankruptcy Court correctly interpreted § 3.1(c) and the ICA as a whole as prohibiting the Second-Lien Claimholders from receiving Collateral proceeds on account of their rights as creditors until LNV is fully paid. *See La Paloma*, 595 B.R. at 474. Receiving and retaining proceeds of Collateral on account of a scheduled claim would violate § 3.1(c) to the same extent that doing so on account of a proof of claim would. Here, proof of claim or no proof of claim, 2L Group concedes its members "are required to pay over all Collateral and proceeds of Collateral to [LNV] until [LNV] [is] paid in full" (ICA Appeal, D.I. 14, ¶ 34), which has not yet occurred.

### c.    Lien Subordination vs. Payment Subordination

Finally, 2L Group contends that the Bankruptcy Court erroneously interpreted the ICA as an agreement for payment subordination, rather than lien subordination. (ICA Appeal, D.I. 14 at

15-16) 2L Group cites the Bankruptcy Court's statement that: "Reading the Intercreditor Agreement as a whole, including the subordination of the Second-Lien Obligations and the waterfall provision in Section 4.1[,] indicate[s] that the parties intended for the First-Lien Obligations to be paid in full before the Second-Lien Lenders are allowed to receive *any recovery* on behalf of the Second-Lien Obligations." *La Paloma*, 595 B.R. at 476 (emphasis added). 2L Group argues that this finding demonstrates that the Bankruptcy Court misread the contract and misapplied precedent. LNV counters that the sentence is being taken out of context, and that later in the ICA Decision, the Bankruptcy Court specifically acknowledged that "[s]ophisticated parties negotiated and entered into [the ICA] with the intention to subordinate the Second-Lien Lenders *to the liens* of the First-Lien Lenders." *Id.* at 477.

The Court agrees with LNV. Ultimately, this issue is nothing more than semantics. Lien subordination was the functional equivalent of payment subordination given the Bankruptcy Court's finding that all remaining distributable assets constituted Collateral. *See id.* at 472 & n.21. The Bankruptcy Court was, therefore, correct when it said "the parties intended for the First-Lien Obligations to be paid in full before the Second-Lien Lenders are allowed to receive any recovery on behalf of the Second-Lien Obligations." *Id.* at 476. It was not necessary for the Bankruptcy Court to qualify the words "paid in full" and "recovery" with "from the Collateral" when all disputed payments and recoveries would necessarily be from the Collateral. Still, the Bankruptcy Court committed no error.

## VI. CONCLUSION

For the reasons explained above, the Court denies the Motions to Dismiss and affirms the Confirmation Order and ICA Decision. A separate Order will be entered.

34